# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANDREW KORTYNA,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **NO. 15-4625** |
| | : | |
| **LAFAYETTE COLLEGE,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                           **March  27, 2017**

Plaintiff Andrew Kortyna filed this employment discrimination and retaliation action against Lafayette College, his former employer.  This is the second employment discrimination action Dr. Kortyna has filed against Lafayette.  Both cases stem from proceedings involving sexual harassment complaints made against Dr. Kortyna by two female students.  Here, Dr. Kortyna brings claims under Title VII, Title IX, the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), and state law for wrongful termination based on "gender stereotyping," disability, and/or his filing a previous employment action.  Lafayette has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the claims are either precluded or fail to state a claim.  For the reasons stated below, I will grant the motion in part and deny it in part.

# I. BACKGROUND[1]

Lafayette College is a private liberal arts college in Easton, Pennsylvania that receives federal funding.  Dr. Kortyna began working as a physics professor at Lafayette in September 2001, received tenure in July 2009, and was terminated on March 31, 2015.

## A.  Student Accusations against Dr. Kortyna

On September 26, 2013, student HW, a senior at Lafayette, filed a complaint with Provost Wendy Hill accusing Dr. Kortyna of sexually harassing her.  On October 2, 2013, Provost Hill telephoned Dr. Kortyna to inform him that a student complaint had been filed against him.

On October 2, 2013, student AB filed a similar complaint of sexual harassment against Dr. Kortyna.  This student is allegedly a close friend of HW.  On October 3, 2013, Provost Hill called Dr. Kortyna to inform him of the second complaint.  Thereafter, the students amended their complaints, with the assistance of Provost Hill, to include more detail.

On October 7, 2013, Provost Hill gave Dr. Kortyna the students' complaints. When he asked to respond to the students' complaints, Provost Hill denied his request. Provost Hill then interviewed him on October 11, 2013.  At that time, she gave him a longer amended complaint by HW, which included more specific details.  HW's amended complaint alleged that the plaintiff was "a man who 'cried,' exhibited emotion, was

---

[1]  The facts are gleaned from the amended complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  Some facts are also gathered from my decision dismissing the first action.  See Kortyna v. Lafayette College, et al., 47 F.Supp.3d 225 (E.D. Pa. 2014).  For the purposes of this motion, however, the facts are presented in the light most favorable to the plaintiff, as the non-moving party, and are accepted as true with all reasonable inferences drawn in his favor.

'lonely,' 'strange,' 'awkward,' and 'disconnected'…"  HW's amended sexual harassment

complaint included the following quotes:

- My impression of him was that he was lonely and disconnected from his family.

- In my mind, Andy was just a strange physics professor like all the rest, albeit a lonely one who likes to form close relationships with his students.

- [When she first] joked about not going into science… [Dr. Kortyna's] eyes tear[ed] up.

- He had a pitiful expression on his face and there were tears in his eyes.

- What had I done that could make a grown man cry on so many occasions?

See Am.Compl. ¶ 28.

On November 6, 2013, Provost Hill informed Dr. Kortyna that she had rejected

AB's complaint but not HW's complaint.  Over the next two weeks, Provost Hill

allegedly "attempted to force" Dr. Kortyna to agree to be dismissed from the College.

Allegedly, Provost Hill indicated that Dr. Kortyna's agreement to be dismissed from the

College would halt the investigations against him and would prevent him from receiving

a suspension.  Provost Hill allegedly refused to negotiate alternative terms, and the

plaintiff ultimately rejected her proposal.

On December 17, 2013, Provost Hill issued two investigative reports.  One found

possible merit in HW's accusations because Dr. Kortyna confronted HW "with intense

and insistent emotional behavior."  The other report found that Dr. Kortyna did not harass

AB but may have retaliated against her for filing her complaint, based on an "apology" he made to her a day or two after she filed it.

On January 3, 2014, Professor Robert Cohn, Chair of Lafayette's Appeal and Grievance Committee, informed Dr. Kortyna that a hearing committee was being formed to address the two student complaints.  On February 3, 2014, Professor Cohn informed Dr. Kortyna that the Lafayette Hearing Committee had been formed and the hearing would occur within twenty-one days.  On February 12, 2014, the Lafayette Hearing Committee informed Dr. Kortyna that the hearing dates were set for March 5, 2014 and March 6, 2014.

**B.  Dr. Kortyna's Mental Health Condition**

As a result of the complaints made against him, Dr. Kortyna began to experience anxiety attacks and bouts of depression.  On October 4, 2013, he suffered an acute anxiety attack.  His physician prescribed him anti-anxiety medication, but Dr. Kortyna continued to suffer daily anxiety attacks.

On October 23, 2013,[2] Dr. Kortyna suffered a severe anxiety attack and was prescribed anti-depressant medication by his physician.  Over the next month, Dr. Kortyna continued to have debilitating attacks, and his medication was increased.

On November 27, 2013, Dr. Kortyna began therapy with Robert Chupella, Ph.D., a psychologist.  He was eventually diagnosed with Major Depressive Disorder, Single Episode, Severe without Psychotic Features, and Panic Disorder without Agoraphobia.

---

[2]  The amended complaint indicates that this attack occurred in 2014.  See Am.Compl. ¶ 50.  It is clear, however, from the context that it occurred in 2013.

On January 31, 2014, Dr. Kortyna was evaluated by Kenneth Weiss, MD, a forensic psychiatrist, who diagnosed depression and anxiety.  In his report dated February 3, 2014, Dr. Weiss "medically concluded that Plaintiff Kortyna would 'require legal counsel to be present'" at his disciplinary hearings as a "reasonable accommodation" for his "disabilities."

### C.  The First Set of Hearings

The first hearing on the student complaints began on March 25, 2014.  Dr. Kortyna was given a faculty member to serve as his advisor/counsel during the hearing per the university's policies and procedures.  Prior to this hearing, Dr. Kortyna requested that his private legal counsel be present at the hearing as an "accommodation" for his mental health condition.  Lafayette denied this request, but provided other accommodations.  Provost Hill allegedly added "new charges" at the start of the hearing.

During the hearing, HW was called to testify.  Dr. Kortyna's "disabilities prevented him from being able to cross-examine HW."  He reserved the right to recall her for cross-examination.  On March 26, 2014, he again requested that his private legal counsel be present at the hearing.  On April 1, 2014, the defendant again denied this request but offered other accommodations.[3]

On April 2, 2014, Dr. Kortyna was admitted to the psychiatric unit at Lehigh Valley Hospital.  On April 7, 2014, Dr. Weiss issued a second report which reiterated the

---

[3] As explained in <u>Kortyna</u> I, the defendant's position was that allowing a private attorney to be a part of this process "would fundamentally alter the nature of the proceedings and the rights accorded to Complainants and faculty under the Faculty Handbook, and would impose an undue administrative burden on the hearing process."  <u>See</u> <u>Kortyna</u>, 47 F.Supp.3d at 232.

need for Dr. Kortyna to have his attorney present at the hearings as a "reasonable accommodation" for his disability:

> In Dr. Kortyna's case, he has developed a severe condition that has substantially impaired major life activities . . . To the extent that the cause of his condition is the proceedings against him, which completely blindsided him, the appropriate label is Adjustment Disorder, classified with Trauma and Stressor Related Disorders . . . With respect to the proceedings in progress, my opinion about Dr. Kortyna's fitness to undertake them is unchanged.  That is, he is presently incapable of representing his interest without the presence of legal counsel.

See Am.Compl. ¶ 72.

On April 9, 2014, Dr. Kortyna registered a complaint of unlawful disability discrimination with the Committee, asserting that the Committee unlawfully failed to accommodate him.

**D.  Dr. Kortyna's First Federal Action**

On April 10, 2014, the plaintiff filed an action in this court, alleging violations of the ADA and Section 504 due to the defendant's failure to provide him with his requested "reasonable accommodation" of having his lawyer present at the hearings.  These were the only employment discrimination claims he alleged.  I granted the defendants' motion to dismiss the complaint, finding that the plaintiff was not legally entitled to the relief he sought.  While the motion to dismiss was pending, the hearings on the student complaints were suspended.  Several events related to Dr. Kortyna's claims in this second action occurred during this timeframe.

### E.  Dr. Kortyna's FMLA Leave

On April 1, 2014, Dr. Kortyna requested medical leave under the FMLA.  On May 26, 2014, Dr. Chupella emailed Lisa Rex, Director of Human Resources-Employment, requesting that Dr. Kortyna be allowed to return from his FMLA leave because he was now "medically capable of doing so."  Ms. Rex allegedly never responded.  On June 6, 2014, Dr. Kortyna emailed Ms. Rex and requested she respond to Dr. Chupella's email. On June 27, 2014, Dr. Kortyna emailed Ms. Rex yet again, requesting the same.  Ms. Rex allegedly did not respond to either email.

In June 2014, Patricia Lechleitner, an Investigator for the Department of Labor, began an investigation into "Defendant's mishandling of Plaintiff Kortyna's FMLA leave."  On July 31, 2014, Ms. Lechleitner instructed Lafayette to permit Dr. Kortyna to return to campus.

On August 1, 2014, Ms. Rex emailed Dr. Kortyna a formal letter advising him that he was "restored from FMLA leave back to [his] full-time position as a Professor."  He was also advised that the "no contact" order between him and HW and AB remained in effect.  Dr. Kortyna viewed this "no contact" order as retaliation for his taking FMLA leave.  He filed a complaint with Ms. Rex alleging FMLA retaliation, but Ms. Rex allegedly did not respond.

### F.  Post-<u>Kortyna</u> I Events While Hearings Were Suspended

While the hearings were suspended and Dr. Kortyna was on FMLA leave, the College Physics department sponsored a public lecture on-campus of an alumnus on May 9, 2014.  Dr. Kortyna and his two student accusers attended the lecture.  Halfway through

the lecture, the Physics Department Chair asked Dr. Kortyna to leave.  At the end of the lecture, Dr. Kortyna stood in the front of the auditorium and told those present that he was being forced off campus.[4]

On May 10, 2014, Dr. Kortyna received an email informing him that he was "unequivocally 'banned' from the defendant's campus due to the events from the previous day."  On May 30, 2014, Dr. Kortyna emailed Alison Byerly, Ph.D., the President of Lafayette, requesting access to his laboratory and office.  She denied his request on June 1, 2014.  On July 7, 2014, Dr. Kortyna emailed Dr. Byerly, "requesting that she lift Defendant's retaliatory ban and allow him to return to campus."  She allegedly did not respond.

After Dr. Kortyna returned from his FMLA leave, Professor Eric Ziolkowski (the new chair of the Hearing Committee) informed the plaintiff that the hearings would begin again in September.  On September 1, 2014, Professors George Panichas and James Wooley met with Acting Provost Cohn to try to negotiate settlement on behalf of Dr. Kortyna.  Provost Cohn—who was involved in the initial hearings—allegedly said that he did not believe the plaintiff violated the defendant's sexual harassment policy "but that [the plaintiff] should still be punished with at least a substantial suspension…because [he] cried in front of the students."

On September 3, 2014 and September 16, 2014, Dr. Kortyna again requested that his attorney be present at the hearings.  On September 16, 2014, he asked for further

---

[4] This information was not mentioned in the plaintiff's amended complaint.  However, the Hearing Committee's report—a document integral to the plaintiff's complaint—discusses Dr. Kortyna's actions during the lecture.

information of other complaints HW and AB had made against other faculty members, but was again denied this information.

On September 17, 2014, the Committee allegedly levied "new, previously-undisclosed charges" of sexual harassment and retaliation against the plaintiff, including an allegation of retaliation related to the May 9, 2014 lecture.  On September 19, 2014, Dr. Kortyna objected to the new charges, but was overruled by the Committee.

On September 19, 2016, I dismissed with prejudice Dr. Kortyna's complaint regarding his ADA claim and request for counsel at his hearing as a "reasonable accommodation."  On September 24, 2016, Dr. Kortyna again requested that he be permitted private counsel at the hearing as a "reasonable accommodation for his disabilities."  The Committee refused to provide this accommodation.  However, the Committee did permit plaintiff's counsel to be on site for the hearings and even worked to accommodate the plaintiff's counsel's schedule.[5]

### G.  The Continuation of the Hearings on Sexual Harassment Charges

On September 29, 2016, the hearing recommenced.  HW refused to appear to testify a second time.  She had graduated from the College the previous spring.  Dr. Kortyna objected to the fact that she would not be available for cross-examination.  The Committee allegedly "abruptly changed the rules governing the questioning of

---

[5] The plaintiff made no reference of this point in his amended complaint.  However, the Committee's report, which was attached to the defendant's motion, explained how hearing dates in September were moved to accommodate the plaintiff's counsel's schedule.  I can consider this information in making my decision because this report is integral to the plaintiff's complaint. <u>See In re Burlington Coat Factory Securities Litigation</u>, 114 F.3d 1410, 1426 (3d Cir. 1997).

I note for clarity that plaintiff's counsel in this action is different from counsel who represented him in his first federal action and during his hearings at Lafayette.

witnesses." The Committee also did not allow Dr. Kortyna to call himself as a witness. It also did not allow Dr. Kortyna to call his psychologist Dr. Chupella to testify "to the effect of Plaintiff' Kortyna's disabilities on actions that were deemed retaliatory by Defendant."

The hearings continued on October 7, 10, 20, 21, and 27, 2014 regarding the charges brought by both HW and AB. According to the plaintiff, "no witness provided any evidence that would support HW and AB's charges of sexual harassment and retaliation—under the standards imposed by the Faculty Handbook—against Plaintiff Kortyna."

### H.  The Hearing Committee's Report and Findings[6]

1.  <u>Report Regarding HW</u>

On November 3, 2014, the Committee issued a report with its findings and recommendations regarding HW's charges, addressed to President Byerly. The Committee outlined the timeline of proceedings and the evidence it considered. The Committee found that there was no evidence that "any actual sexual contact occurred between Professor Kortyna and Ms. HW." However, the Committee also found that Dr. Kortyna had violated the College's sexual harassment and retaliation policies regarding "hostile environment" (B.2.2.1.4), "the special relationship between faculty and student"

---

[6] The information in this section is taken from the Hearing Committee's Report, which was attached to the defendant's motion. The plaintiff's amended complaint was selective in the points it included from this report. I can consider this information in making my decision, out of fairness and because the plaintiff relied on the report in his amended complaint. <u>See</u> <u>In re Burlington</u>, 114 F.3d at 1426.

(B2.2.2), and "intimidation and retaliation" (B.2.4.2.1).[7]  The Committee based its

findings on "written communications from Professor Kortyna and Ms. HW as well as

documented personal interactions [that] could subjectively and reasonably have been

perceived by her as unwelcome expressions of a romantic or implicitly sexual nature (viz.

FH B.2.2.1), to the point that it gave rise to what she could have reasonably perceived as

a 'hostile environment [...] permeated with discriminatory intimidation [...and]

offensiveness' to the extent of 'interfer[ing] with [Ms. HW's] academic or work

---

[7] These provisions state:

   B.2.2.1  Definition of Sexual Harassment

   The term "sexual harassment" includes the following: an unwelcome sexual advance,
   unwelcome request for sexual favors, or other unwelcome expressive, visual, or physical
   conduct of a sexual nature, when:
       B.2.2.1.4 such conduct has the purpose or effect of creating a hostile environment.
       (A "hostile environment" is one which is permeated with discriminatory
       intimidation, ridicule, offensiveness, or insult that is sufficiently severe or
       pervasive to interfere with an individual's academic or work performance.)

   B.2.2.2  General Rule Prohibiting Sexual Harassment

   Sexual harassment is a form of discrimination which violates the standards of conduct
   expected of every member of the College community. Sexual harassment will not be
   tolerated in any context, whether it be between faculty and students, faculty and other
   faculty, coaches and athletes, supervisors and employees, staff and students, students and
   other students, worker and co-workers, or others.

   For members of the Lafayette community, all forms of sexual harassment are prohibited.
   In addition, the special relationship between faculty and student, and supervisor and
   subordinate, requires particular attention below.

   B.2.4.2.1  Filing of Complaint

   ...Threats or any other form of intimidation and retaliation against any member of the
   College community who exercises his/her right to initiate a complaint or inquiry in good
   faith under this policy is strictly prohibited and will itself be cause for appropriate
   disciplinary action.

performance' (FN B.2.2.1.4).[8]  The Committee considered Dr. Kortyna's "use of intimate

and emotive language" in his communications with HW, along with Dr. Kortyna's

testimony that he perceived HW as having "always been a little bit flirtatious" such that

he "felt there was a sexual tension from very early.[9]  The Committee also pointed out that

certain actions by Dr. Kortyna could have been perceived by the student as "romantic"

(e.g., voluntarily driving her alone sixty miles from Easton to Newark Airport, and

hugging her on multiple occasions), especially given his use of "intimate" language.[10]

       The Committee further found that Dr. Kortyna "spoke and acted in ways that

violated the 'special relationship between a faculty member and a student' (FH B.2.2.2)."

Id. at 10.  The Committee cited evidence that HW had made it clear to Dr. Kortyna that

she was uncomfortable with how he framed their teacher-student relationship as being

more than an academic-professional one.  The Committee also noted one instance in

---

[8] See Defendant's Motion to Dismiss, Doc. No. 22, Ex. 5 at 6-7 (filed under seal)(quotation
marks omitted).  The Committee cited seven different communications by Dr. Kortyna to HW
between March 29, 2013 and September 15, 2013 in which Dr. Kortyna alluded to their
"friendship" and "relationship."  The Committee expressed concern for Dr. Kortyna's "rhetoric
of intimacy with Ms. HW" overshadowing their teacher-student interactions.  Id. at 8.

[9] Dr. Kortyna also testified that he "tried to guard against her developing a crush on [him], which
we know sometimes does happen—in student-teacher relationships."  The Committee considered
Dr. Kortyna's communications with HW to be especially inappropriate given his understanding
of how HW viewed him/how he viewed the situation.  Id. at 8.

[10] The Committee also took issue with how Dr. Kortyna often took disproportionate credit for
HW's success and often did not treat her as an independent agent and/or potential future
professional.  Id.  For example, Dr. Kortyna became upset when HW broke from the "plan" he
encouraged her to follow regarding her professional career.  They noted how Dr. Kortyna
recognized that his behavior had made HW feel uncomfortable and "afraid" of his reaction to her
decision.  Though the Committee recognized this was not an outright violation of the Faculty
Handbook, it considered these actions to exacerbate the "hostile environment" he had created
around HW.  Id. at 8-9.

which Dr. Kortyna became upset with HW but then told her "he was still willing to write recommendation letters" for her.  Id. at 11.

Lastly, the Committee discussed evidence of retaliation by Dr. Kortyna against HW for filing her complaint.  In an email titled "Gentlemen: discussion and free food!" in February 2014, he wrote to six other colleagues in the Physics department about the sexual harassment complaint and pending proceedings; he specifically named HW and told them that she was "currently attempting to have [him] dismissed from the College." Id. at 12.  The Committee took issue with this email because it falsely indicated that HW had proposed sanctions against him and also that this jeopardized HW's relationship with other members of the faculty of her major with whom she would have to work and by whom she would be evaluated.[11]  They voiced concerns about Dr. Kortyna's breach of the confidentiality of the investigation and pending proceeding.

The Committee also discussed the May 9th Physics Department lecture, which Dr. Kortyna attended while on FMLA leave.  "As attested by multiple witnesses, and disputed by none, following [the] lecture Professor Kortyna stood near the front and exclaimed to everyone present that he was being dismissed from or 'thrown off' or 'kicked off' campus."  Id. at 13.  The Committee considered this act, especially in light of the previous email to colleagues, to be "brazenly retaliatory."  Id.  The Committee also

---

[11] It should be noted that HW was in her last year of study and graduated in 2014.

noted that HW was present in the front rows of the auditorium in which the lecture was held.[12]

Prior to this event, Dr. Kortyna had been advised not to have contact with HW and AB.[13]  Though the Committee could not determine that Dr. Kortyna's presence at the event violated the no-contact orders in place, they expressed concern over Dr. Kortyna's judgment in attending and also moderating a Q&A after the lecture, given the circumstances.

The Committee also cited two emails sent to HW by Dr. Kortyna's attorney, which it considered clear forms of intimidation.  In one sent on January 27, 2014, David Ferleger, plaintiff's attorney in the first federal action, identified himself as the plaintiff's lawyer and requested that she meet with him "regarding [her] potential testimony."  Mr. Ferleger also "encourage[ed her] to thoughtfully consider a positive response to this invitation."  Id. at 14.  The Committee considered this email to be a clear act of retaliation, intended to put HW in fear.

On April 26, 2014, while the hearing was suspended because the plaintiff was on FMLA leave and after the first federal action regarding the plaintiff's right to have an

---

[12] During the lecture, HW had emailed President Byerly, Provost Hill, the Hearing Committee Chair, and her faculty counsel before the outburst to indicate that she felt "extremely intimidated by [Dr. Kortyna's] presence" and that she was "shaking as [she] wrote the email."  Id. at 13.

[13] The Committee indicated that Provost Hill had instructed Dr. Kortyna in an October 9, 2013 email: "Let me be clear: should you see the two students you should have no verbal interaction with them or interact with them in any way."  Id. at 14.  The plaintiff did not include this information in his amended complaint.  There was other evidence in the report noting that he was also read aloud the terms of a no-contact order by the College's Associate Director of Public Safety James Meyer in March 8, 2014, prohibiting him from engaging in "any and all contact in person" with HW.

attorney present at the hearing had been filed, Mr. Ferleger again contacted HW by email. The April email reiterated the points of the previous email and also suggested that she had "defamed" Dr. Kortyna and that there may be "impending litigation."  He advised her to contact her attorney before responding.[14]  The Committee considered this email to be a clear act of retaliation and a violation of the March no-contact Order, which indicated that neither the plaintiff nor his "intermediary" shall contact HW in person or by email.

After making its findings, the Committee recommended a two-year, unpaid suspension as a sanction and a ban from campus during this time period.[15]  The Committee stated that Dr. Kortyna's lawsuit "was an appeal to the federal court system to interfere with the College process, and to insist that Professor Kortyna's outside counsel be permitted to participate in the Hearings [demonstrating] both Professor Kortyna's and Mr. Ferleger's disregard for the College Hearing Committee and process."

The Committee also viewed the plaintiff's "repeated…attempts during the late Spring and Summer of 2014 to file a complaint of sexual harassment against [HW and AB] to the Student Conduct Committee" as "retaliation" against those students.  They indicated that Dr. Kortyna used and/or abused his FMLA leave privileges by "subvert[ing] and complicat[ing] the Defendant's investigation" while also trying to

---

[14] I note that Lafayette was concerned about having lawyers involved in these proceedings for situations such as this.

[15] The Committee also recommended that:  Dr. Kortyna receive counseling, the counselor and Lafayette would determine if he was able to return to teaching, he would not be allowed to serve as an advisor or hold certain positions of authority, and he could not contact HW nor discuss the case with others thereafter.  Id. at 17.

institute new proceedings against the students through the filing of his own sexual

harassment complaints against them.

2. Report Regarding AB

On November 19, 2014, the Committee issued a report with its findings and

recommendations regarding AB, again addressed to President Byerly.  The Committee

outlined the timeline of proceedings and the evidence it considered.  The Committee

found that "the preponderance of the evidence indicates that Professor Kortyna violated

[the College's sexual harassment retaliation policy] in multiple ways and in multiple

instances" in violation of Faculty Handbook Appendix B.2.2.1 and B.2.4.2.1.[16]  While the

Committee found AB's sexual harassment complaint to be meritless, it also found the

complaint was filed in good faith.  Id. at 6-7.

The Committee described several incidents in which it appears Dr. Kortyna was

acting in retaliation for AB's filing her complaint.  The first occurred on October 4, 2013,

the day she filed the complaint.  Dr. Kortyna's sought out AB in person and, while

crying, apologized to her.  He then told her that he was "probably going to get fired for

this."[17]  After hearing Dr. Kortyna's testimony on the incident, the Committee viewed it

as one meant to provoke guilt in AB.  The Committee noted that it did have such an

effect.  AB wrote Provost Hill on the night of October 4, 2013 saying that "she felt

---

[16] Defendant's Motion to Dismiss, Doc. No. 22, Ex. 6 at 6 (filed under seal).

[17] Id. at 7-8. (quotation from Dr. Kortyna's testimony to the Committee).  The Committee was
concerned by Dr. Kortyna's continued lack of understanding how this action was inappropriate
under the circumstances.  He repeatedly appeared to interpret AB's reaction as one wrought from
true feelings of guilt or shame and not because his actions were intimidating.  Id. at 9.

distraught and guilty and considered telling Professor Kortyna 'it was okay and not to worry about what happened.'" Id. at 8.  The Committee also took issue with the fact that Dr. Kortyna contacted AB after being explicitly instructed not to do so by Provost Hill on October 3, 2013.  Id.

The second incident was the May 9th lecture, during which Dr. Kortyna stood up in an auditorium of students, "announced that he was being thrown off campus, and then stormed out of the hall."  Id. at 10-14.  AB was present at this lecture and left the event "crying."  She indicated that other faculty members associated the event with her and expressed implied disapproval towards her.  The Committee cited to evidence, which supports her interpretation of events, and viewed this May 9th incident as retaliatory.

Next, the Committee discussed two emails sent by Dr. Kortyna's attorney after AB had filed her charge against him.  Id. at 14-17.  Though Dr. Kortyna claims he did not ask his lawyer to send them, both emails indicate that Dr. Kortyna's lawyer was doing so as part of his representation of Dr. Kortyna in his first federal action.  The first email sent on January 27, 2014 requested that AB meet with the attorney to discuss her potential testimony at the hearing on her harassment complaint.

The second email was sent on June 30, 2014, after the hearing had commenced and then been suspended, and while Dr. Kortyna was on FMLA leave.  It was sent after the Associate Director of Public Safety James Meyer had read aloud the "Prohibition from Contact Notice" to Dr. Kortyna, informing him that neither he nor his agents should contact AB.  The email warned: "Please refrain from repeating your accusations [to other faculty members].  You are at risk of being held responsible for doing so."  The email

also stated that "[her] accusation of sexual harassment was false" and that "the Provost did not accept it for forwarding for a hearing." AB did not understand the basis for the email. The email "completely panicked" her. The Committee noted that this email was sent on the night that Provost Hill was stepping down from her position; they considered this timing (especially considering its reference to the Provost) to "exacerbate[] the extremely intimidating effect that this message must have had on Ms. AB."[18]

The Committee then discussed at length Dr. Kortyna's attempts during late Spring and Summer of 2014, while the hearing on complaints against him was suspended, to file sexual harassment complaints against AB and HW. The Committee explained that Dr. Kortyna made a complaint to the Student Conduct Committee. He called for the two students' permanent expulsion from the College because they had filed sexual harassment complaints against him.[19] He attached confidential documents related to the proceedings on the students' sexual harassment charges against him to his SCC complaints against AB and HW.

---

[18] The Committee again was concerned about Dr. Kortyna's inability to understand how the actions by his lawyer could be retaliatory. When asked whether he thought AB could reasonably have perceived the June email as intimidating, he flatly responded: "No. She was defaming me." Id. at 16.

[19] Id. at 17; see also id. at 17-20. The Committee also noted how Dr. Kortyna's filing of these complaints with the Student Committee was improper and that his decision to take this course to file these complaints implied his intent to intimidate AB and HW. The procedure was intended for students to file complaints against other students. Furthermore, the procedure provides that a complaint can be filed with the Dean or the Student Conduct Committee. In a June 5, 2014 email to Dean McLoughlin, he stated: "[…] the option is provided to the complainant to have a complaint heard by either the Dean or the Student Conduct Committee. I would like to propose that I present the complaint before the Student Conduct Committee." Id. at 18.

On May 14, 2014, Dr. Kortyna sent a memo to Dean D'Agostino, Dean McLoughlin, Mr. Greg Meyer, and Professor Jennifer Kelly asking that the SCC proceedings against the two students be started "immediately."  In a follow-up email on May 22, 2014, Dr. Kortyna requested "verification that the complaint [i.e., the SCC complaint he had tried to file through those same recipients six days earlier] has been transmitted to [AB and HW]."  On May 23, 2014, Dr. Kortyna emailed Dean McLoughlin that he was "await[ing] verification that this complaint has been transmitted to [AB and HW]."  Id. at 17-18.  The Committee noted how the transmission of Dr. Kortyna's SCC complaints to AB and HW appeared to be another way for him to subvert the "no contact" order with the students.  It found these actions to be retaliatory, especially considering Dr. Kortyna's testimony that he was "angry" about the May 9th incident at the lecture.

Lastly, the Committee outlined several interactions Dr. Kortyna had with persons related to AB involving disparaging remarks.  AB's supervisor at a local coffee shop testified that Dr. Kortyna had made unsolicited disparaging remarks to him about AB's grades during the early summer of 2014.  The Committee noted how Dr. Kortyna's attorney contacted AB's roommate during the 2013-14 school year, requesting information about AB's complaints.  The roommate testified, in light of this conversation with Dr. Kortyna's attorney: "[I] realized that I did not know the whole story.  And I felt like I was being unfair to not continue the relationship I'd had with Andy […] So I went to see how he was doing…He was very emotionally hurt by it."  Id. at 21.  In April, Dr. Kortyna's attorney again contacted AB's roommate to "relate an update about the trial."

Id. at 22.  After the May 9th incident, Dr. Kortyna had also emailed the roommate and indicated that AB was the one trying to get him removed.  In another email exchange, he told the roommate "AB is trying to use you to have me dismissed from the college."  Id.

AB also testified that other physics majors and professors made remarks, which could be construed as related to her complaints against Dr. Kortyna.  Id.  Another female physics major told her Dr. Kortyna "jokingly" remarked that he hoped the other female student would not file a harassment complaint against him.  Id.  That same student told AB (*via* a Facebook message) that Dr. Kortyna told her that "AB and HW have been spreading lies about me."  Id.  The Committee also cited statements made by close friends of HW and AB that Dr. Kortyna told them they "would regret filing [their complaints]" and that "he would come after [them] personally with a lawsuit."  Id.

The Committee noted that AB considered transferring to another university in Spring 2013 and has trouble trusting other professors as a result of her interactions with Dr. Kortyna.

Because the Committee considered these incidents to be "grav[e] and persisten[t]" acts of retaliation and intimidation in violation of Faculty Handbook Appendix B.2.1 and B.2.4.2.1, the Committee recommended that Dr. Kortyna be "permanently separated from the College, effective immediately."  Id. at 23-24.

### I. The Hearing Review Committee's Findings

Dr. Kortyna objected to the Committee's findings and recommendations.  He appealed for review of its reports by a Hearing Review Committee, per the College's

prescribed procedures.  Dr. Kortyna submitted a list of procedural errors to the Review

Committee on both reports. [20]

On November 26, 2014, the Hearing Review Committee issued its report related to

HW to President Byerly.  See Defendant's Motion to Dismiss, Doc. No. 22, Ex. 7 (filed

under seal).  The Hearing Review Committee found that Dr. Kortyna's inability to cross-

examine HW in violation of Faculty Handbook B.3.10 was immaterial and other changes

in the procedure regarding calling witnesses also did not affect the outcome of the

hearing.[21]  The Review Committee dismissed Dr. Kortyna's claim that the Committee's

consideration of acts of retaliation without new formal charges against him being filed

was improper, explaining that requiring a separate charge for each retaliatory act would

cause "an endless cycle of investigations."  Id. at 3.  The Review Committee agreed with

---

[20] The Hearing Committee noted six procedural irregularities in the hearing process:
    (1)  The Provost encouraged the student complainant to propose possible sanctions;
    (2)  Provost Hill's divergence from prescribed procedures when she asked him to respond to the student on October 2, 2013 without providing him with the details of the charges against him and that she questioned him about the details of HW's complaint that elaborated on her charges before given him this document;
    (3)  Dr. Kortyna's meeting with an ad hoc committee of the Dean, another Professor, and members of the Presidential Oversight Committee on Sexual Assault and Sexual Harassment in March 2014, without the knowledge of the Provost or the Hearing Committee;
    (4)  The Involvement of the College President;
    (5)  Inadequate communication from the College to the Committee and the complainant;
    (6)  Efforts by Dr. Kortyna to "stall, subvert, and undermine the Hearing Process."

Nonetheless, the Hearing Committee found those irregularities were immaterial.  After discussing each area of procedural deviation, the Review Committee found that "none of these concerns or irregularities had any material effect on [the] Committee's findings or recommendations concerning the [complaints] against Professor Kortyna."  See Defendant's Motion to Dismiss, Doc. No. 22, Ex. 5 at 30 and Ex. 6 at 40 (filed under seal).

[21] The Review Committee also found that Dr. Kortyna's assertion that the College's decision failed to represent his academic rights by banning him from campus during the summer of 2014 was not a procedural error by the Hearing Committee appropriate to raise on review.  Id. at 2.

Dr. Kortyna that the evidence of his "outburst" at the May 9th lecture was non-germane evidence because he was given permission in October 2013 to attend the lecture and his remarks at the event were not directed at anyone specifically.  Id. at 3.

The Review Committee agreed, to some extent, that the sanctions against Dr. Kortyna as to HW were too harsh and not consistent with the factual findings.  It recommended similar sanctions but reduced the amount of time on suspension and recommended Dr. Kortyna not be banned from campus during the suspension.  Id. at 3-4.

On December 17, 2014, the Hearing Review Committee issued its report regarding AB's case to President Byerly.  See Defendant's Motion to Dismiss, Doc. No. 22, Ex. 8 (filed under seal).  The Review Committee offered the same observations about the hearing, as it explained in HW's report, regarding procedural errors.  However, unlike the report on HW, it found that the "sanction of separation from the College…is consistent with the factual findings of the [Hearing Committee.]"  Id. at 5.

Overall, the Review Committee ultimately recommended that the two-year recommended suspension for HW's charges should be reduced to six months but also upheld the Committee's recommendation to terminate Dr. Kortyna based on actions taken towards AB.  Dr. Kortyna claims the Review Committee failed to address his objections.

**J.  Dr. Kortyna's Eventual Termination**

On January 16, 2015, President Byerly issued two letters to Dr. Kortyna.  Based on the findings and recommendations of the Hearing Committee and the Hearing Review

Committee, President Byerly determined that the termination of Dr. Kortyna was appropriate.[22]

On February 3, 2015, Dr. Kortyna appealed President Byerly's decision to the College's Board of Trustees.  On March 30, 2015, the Board of Trustees affirmed President Byerly's decision to terminate the plaintiff.  Dr. Kortyna was allegedly replaced with "a less-qualified, less-experienced, and non-disabled individual."

### K.  Dr. Kortyna's Second Federal Action

After exhausting his administrative remedies, Dr. Kortyna filed this action on August 14, 2015,[23] asserting employment discrimination claims under Title VII, Title IX, the ADA, the FMLA, and state law.  He claims that he was terminated because of his sex, disability, and/or invocation of rights under the ADA and/or the FMLA.

The amended complaint relies heavily on alleged procedural irregularities in the investigation of the sexual harassment complaints brought against Dr. Kortyna. Accordingly, I will briefly outline the procedures prescribed by the Lafayette Faculty Handbook.

    1.  <u>Lafayette's Procedure for Investigating Sexual Harassment by Faculty Members</u>[24]

---

[22] According to Dr. Kortyna, President Byerly "purposefully chose to forgo the Review Committee's lesser proposed sanction in the HW case of six (6) month suspension, instead electing to adopt the Hearing Committee's more extreme sanction of a two (2) year suspension."

[23] This case was not filed as related to the previous action and was assigned to Judge Leeson.  It was then reassigned to me, after the defendant brought this point to the court's attention.

[24] Information in this section is taken from the Lafayette Faculty Handbook, Appendix B (Lafayette College Policies on Sexual Assault and Sexual Harassment)(attached to plaintiff's Amended Complaint, Document #18)(hereinafter "Sexual Harassment Policy").

The College's policy on Sexual Harassment and Sexual Assault covers both advances indicating a sexual relationship and those of a "romantic" nature.  The sexual harassment policy "prohibits retaliation against individuals for bringing complaints of sexual harassment."  The College "will take disciplinary action against persons who attempt such retaliation."[25]  Any member of the College community who violates the sexual harassment policy may be subject to a full range of discipline including separation from the College.

While the policy indicates that sexual harassment in not tolerated between any members of the College community, sexual harassment by a teacher against a student is given heightened attention.  Specifically, "an instructor must desist from any expression of a sexual or romantic interest if there is any indication by that student that such interest is unwelcome" and "no instructor shall indicate, explicitly or implicitly, that an academic reward or punishment could result from the student's reaction to an instructor's sexual or romantic advance."  Id. at B.2.2.3.1.b(i) & (ii).

Allegations of sexual harassment against members of the faculty should be made to the Provost of Lafayette College.  Allegations against students are filed with the Dean of Students (not the Student Conduct Committee).  The Provost is responsible for investigating the complaint.  At the start of the investigation, the Provost should inform the accused faculty member of the applicable policies and procedures, along with a copy

---

[25] Id. at B.2.1.  This point is reiterated in the section about "Filing a Complaint:"  "Threats of any other form of intimidation and retaliation against any member of the College community who exercises his/her right to initiate a complaint or inquiry in good faith under this policy is strictly prohibited and will itself be cause for appropriate disciplinary action."  Id. at B.2.4.2.1.

of the complaint and the identity of the accuser.  The faculty member is then given the

opportunity to respond.  When the investigation is finished, the Provost informs the

parties in writing of the outcome. "Possible outcomes of the investigation by the Officer

are: (a) a judgment that the allegations are not warranted, (b) a negotiated resolution of

the complaint, or (c) a judgment that there is a reasonable basis for concluding that a

violation of this policy has occurred."  Id. at B.2.4.2.3.

    If the Provost determines there is a reasonable basis for concluding there is a

violation of the policy, the Provost shall attempt to negotiate a resolution.  If a resolution

cannot be reached, the Provost is required to report her findings to the accused and the

complainant.  "At this stage, the accused may elect to have the Provost resolve the matter

by accepting the sanctions recommended by the Provost."  Id. at B.3.3.  The alternative is

to have the case presented to a Hearing Committee, which is a group of five disinterested

tenured faculty members formed to hear the case.[26]

    Faculty disciplinary hearings in front of the Hearing Committee look like court

proceedings.  The Provost is responsible for presenting witnesses and evidence against an

accused faculty member.  The Chair of the Hearing Committee presides over the

proceedings like a judge.  The accused faculty member is responsible for presenting

his/her case and may be accompanied only by Faculty counsel of his choosing to provide

advice during the hearing.  Each "party" has the right to examine and cross-examine

witnesses and introduce evidence.  The accused faculty member has the right to question

---

[26] The accused is also afforded a written investigative report by the Provost, including the
proposed sanctions.  He/she then has ten days to file a written response.  This information along
with the initial complaint is forwarded to the Hearing Committee.

the complainant directly.  The Hearing Committee may call the accused as a witness; the accused can elect not to testify.  "The Hearing Committee shall normally hold a Hearing within twenty-one calendar days of its formation."  Id. at B.3.5.

After the hearing is held, the Committee deliberates over what was presented and may determine by a preponderance of the evidence if there was a violation of the sexual harassment policy and what sanctions would be appropriate.  The findings of the Committee are then reviewed for fairness by the Hearing Review Committee.[27]  The Hearing Review Committee reviews the full hearing record and evidence.  The Hearing Review Committee's role is to ensure that the below proceeding was fair but not to make its own factual findings.  If the Hearing Review Committee finds flaws in the hearing process, it may require the Hearing Committee to reopen the proceedings to correct those flaws or may, in certain circumstances, do its own *de novo* review and findings.  The Review Committee then issues a written report.

The reports of the Hearing Committee and Review Committee along with the full record of the hearing are then reviewed by the College President.  The President may accept, reject, or modify the Committee's recommendations.  The President shall make her decision within thirty days.

An accused who does not accept the President's decision may appeal to the Board of Trustees within fourteen days.  The Board reviews the decision for procedural errors

---

[27] The Hearing Review Committee is made up of three of the six elected members of the College's Promotion, Tenure, and Review Committee.  The three members of the Review Committee should also be disinterested.

only.  If the President determines the accused should be terminated, the termination is only effective after a vote by the Board.

## II.  STANDARD OF REVIEW

The defendant moves to dismiss based on claim preclusion, issue preclusion, and/or Rule 12(b)(6).  A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

In deciding a motion to dismiss, the court should consider the allegations in the complaint.  See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  The court may also consider documents attached to the defendant's motion to dismiss when the documents are "integral to or explicitly relied upon in the complaint."  In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997).  The court's ability to consider such documents is one rooted in fairness; otherwise, a plaintiff's legally deficient claim could survive a motion to dismiss simply because the plaintiff did not attach the appropriate documentation.  See Pension Benefit Guar. Corp., 998 F.2d at 1196.  A court's consideration of such

documents does not convert a motion to dismiss to a motion for summary judgment because a plaintiff would have notice of documents on which he relies in writing his complaint and, therefore, would have the opportunity to respond to them in kind.  See id. at 1196-97.  A plaintiff cannot maintain a claim "by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement [did not support the claim]."  Mele v. Federal Reserve Bank of New York, 359 F.3d 251, 256 n. 5 (3d Cir. 2004)(citing In re Burlington Coat Factory, 114 F.3d at 1426).  "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited."  In re Burlington Coat Factory, 114 F.3d at 1426 (citations omitted).[28]

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim.  Conley, 355 U.S. at 47.  Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.  The "complaint must allege facts suggestive of [the proscribed] conduct."  Twombly, 550 U.S. at 564.  Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true.  See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Se. Pa.

---

[28] See also In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation, 7 F.3d 357, 368 n. 9 (3d Cir. 1993)("Although the plaintiffs did not attach the prospectus to their complaint, the defendants appended it to their motion to dismiss.  We recently held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Benefit, 998 F.2d at 1196.  Because the complaint directly challenged the prospectus, the district court properly considered the prospectus in deciding whether to grant the Rule 12(b)(6) motion.")

Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).  The claim must contain enough factual

matters to suggest the required elements of the claim or to "raise a reasonable expectation

that discovery will reveal evidence of" those elements.  Phillips v. County of Allegheny,

515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

A court "may dismiss a complaint only if it is clear that no relief could be granted

under any set of facts that could be proved consistent with the allegations."  Brown v.

Card Serv. Ctr., 464 F.3d 450, 456 (3d Cir. 2006)(quoting Hishon v. King & Spalding,

467 U.S. 69, 73 (1984)).

## III. DISCUSSION[29]

### A.  Issue Preclusion

In Counts V and VII, Dr. Kortyna claims that he was discriminated against based

on "his actual and/or perceived disabilities" and was terminated as a result.  The

defendants argue that these claims were previously addressed in Kortyna I, and that they

should be dismissed based on principles of issue preclusion.  I agree.

"Issue preclusion, formerly titled collateral estoppel, proscribes relitigation when

the identical issue already has been fully litigated."  Board of Trustees of Trucking

Employees of North Jersey Welfare Fund, Inc. – Pension Fund v. Centra, 983 F.2d 495,

505 (3d Cir. 1992).  Issue preclusion applies when four factors are present:

(1)  the identical issue was decided in a prior adjudication;

(2)  there was a final judgment on the merits;

---

[29] This court has jurisdiction over this action because of the federal questions it presents.  Venue
is appropriate here because the defendant is located in this district and the activities complained
of occurred in this district.  See 28 U.S.C. § 1391(b)(1) and (2).

> (3)     the party against whom the bar is asserted was a party
>            or in privity with a party to the prior adjudication; and
>
> (4)     the party against whom the bar is asserted had a full and
>            fair opportunity to litigate the issue in question.

Id.  Here, each of these factors is satisfied.  In this case and in <u>Kortyna</u> I, the plaintiff

asserts ADA and Section 504 claims based on the fact that he was not permitted to have a

private attorney at the hearings, as a "reasonable accommodation" for his disabilities.[30]  I

squarely rejected those claims and dismissed them with prejudice over two years ago in

<u>Kortyna</u> I, and my decision is a final judgment on the merits.  Although Dr. Kortyna did

not appeal my decision, he continues to assert that he is entitled to that relief.[31]

Nevertheless, as the party who brought the previous action, Dr. Kortyna was given a full

and fair opportunity to litigate the question of whether the ADA and/or Section 504 were

violated.  Accordingly, because the factors for issue preclusion are satisfied, I will

dismiss the plaintiff's ADA and Section 504 discrimination claims in Counts V and VII.

### B.  Claim Preclusion

The defendant also argues that claims based on "discriminatory acts" asserted

before Dr. Kortyna filed <u>Kortyna</u> I (i.e., before April 10, 2014) are also precluded by

---

[30] The plaintiff argues in his response to the defendant's motion to dismiss that there is not a "failure to accommodate" claim in this action.  The amended complaint's allegations, however, are not so clear.  The ADA and Section 504 discrimination claims incorporate facts related to the College's alleged failure to accommodate the plaintiff's disability, which are found in both <u>Kortyna</u> I and <u>Kortyna</u> II (as evidenced by the plaintiff's own citations in his response brief).  Nevertheless, to ensure that the plaintiff's claims are adjudicated appropriately, I will briefly explain why they are precluded.

[31] <u>See</u> Am.Compl. ¶ 97 ("On or about September 24, 2014, despite Plaintiff Kortyna's reiterated request for private counsel as a reasonable accommodation for his disabilities, the Committee again refused to provide said reasonable accommodation.")

claim preclusion.  "The purpose of claim preclusion is to avoid piecemeal litigation of claims arising from the same events."  Churchill v. Star Enterprises, 183 F.3d 184, 194 (3d Cir. 1999).  If a particular issue could have been raised in an earlier proceeding but it was not, claim preclusion gives dispositive effect to the prior judgment on those issues which could have been raised but were not actually litigated.  Id.  The purpose of this doctrine is "to require a plaintiff to present all claims arising out of the same occurrence in a single suit."  Id. (citation omitted).

Claim preclusion applies if: (1) there is a final judgment on the merits of a prior suit; (2) the parties in the two actions are the same; and (3) the subsequent suit is based on the same "cause of action."  Id. (citing U.S. v. Athlone Indus., Inc., 746 F.2d 977, 984 (3d Cir. 1984)).  As explained above, the first two factors are met: Kortyna I is a final judgment on the merits, and Kortyna I and Kortyna II involve both Dr. Kortyna and Lafayette College.  The third factor, however, is not as clear.

"Whether two lawsuits are based on the same cause of action 'turn[s] on the essential similarity of the underlying events giving rise to the various legal claims.'"  Id. (citations omitted).  The Third Circuit interprets "cause of action" broadly.  Id. (citing U.S. v. Athlone Indus., Inc., 746 F.2d 977, 984 (3d Cir. 1984)).  "Courts should not apply this conceptual test mechanically, but should focus on the central purpose of the doctrine, to require a plaintiff to present all claims arising out the same occurrence in a single suit."  Id. (quoting Athlone, 746 F.2d at 984).

In this second action, Dr. Kortyna includes two other types of discrimination claims: (1) direct acts of discrimination based on sex and disability, and (2) acts of

retaliation against him for objecting to those discriminatory acts.  Regarding the first type

of discrimination, the allegations in <u>Kortyna</u> I and the allegations in <u>Kortyna</u> II up until

April 14, 2014, are almost identical.  The "thrust of the two complaints" is the same—

whether the commencement of an investigation into and a hearing on accusations against

Dr. Kortyna were the result of discriminatory acts by the College.  See <u>Churchill</u>, 183

F.3d at 195.  The only real difference in <u>Kortyna</u> II's recitation of events prior to the first

lawsuit is the addition of allegations that these discriminatory acts were premised on sex

and not just disability.[32]  Specifically, Dr. Kortyna claims that Provost Hill denied him

the right to a "non-discriminatory investigation based upon his sex."  See Am.Compl. ¶

32.

Provost Hill's investigation had been complete for several months before <u>Kortyna</u>

I was filed.  If Dr. Kortyna was concerned that Provost Hill's investigation and the

subsequent hearing were the result of sex discrimination, then he could have and should

have asserted that basis for liability in the <u>Kortyna</u> I complaint.  Nonetheless, he did not

bring any claims or allege any facts that would indicate violations of Title VII, Title IX,

or the PHRA based on sex.

---

[32] Dr. Kortyna alleges that he had made five complaints of sex discrimination to various College officials.  On November 19, 2013, November 20, 2013, and November 24, 2013, Dr. Kortyna allegedly emailed Leslie Muhlfelder, the defendant's EEO Officer and Title IX Coordinator, to report this sex discrimination.  Ms. Muhlfelder allegedly failed to respond to his emails.  On December 5, 2013, Dr. Kortyna allegedly filed a formal grievance against Provost Hill for sex discrimination.  The person to whom this grievance was made was not alleged.  The defendant allegedly did not respond to the complaint.  On March 4, 2014, Dr. Kortyna allegedly filed another formal complaint of sex discrimination with John McKnight, the Dean and newly designated Title IX Coordinator.

Dr. Kortyna argues, however, that sex discrimination allegations could not have been brought in his prior lawsuit.  I do not agree.  By the time Kortyna I had been filed, Dr. Kortyna was well aware that the sexual harassment charges being brought against him would proceed to a hearing.  If he believed that those charges and the hearing were premised on sex discrimination, he could have and should have asserted such a theory in the first federal lawsuit.  As the facts here indicate, Dr. Kortyna had already lodged claims of sex discrimination against his employer.  It would be unfair to allow him to litigate these claims now when he could have brought them previously.  For this reason, Dr. Kortyna is barred from asserting violations of Title VII, Title IX, or the PHRA based on events occurring prior to April 10, 2014, and I will dismiss these claims based on claim preclusion.[33]

### C.  Remaining Claims based on Events After the Filing of Kortyna I

Putting aside conduct occurring before the filing of the first federal lawsuit, what remains are allegations that Dr. Kortyna was terminated illegally based on sex, disability, or the invocation of his FMLA rights.

#### 1.  Claims of Sex Discrimination

Dr. Kortyna claims that the College discriminated against him and/or retaliated against him based on his sex and his "failure to conform to sex stereotypes" resulting in

---

[33] I note that those claims which are premised on discriminatory or retaliatory acts occurring after the first federal law suit was filed are not precluded here.  See Morgan v. Covington Tp., 648 F.3d 172, 178 (3d Cir. 2011).

the loss of his employment.  He brings these claims under Title VII, Title IX,[34] and the PHRA.[35]

Title VII prohibits employment discrimination on the basis of sex.  See 42 U.S.C. § 2000e–2.  In order to state a claim for discriminatory discharge under Title VII, the plaintiff must allege that: (1) he is a member of a protected class; (2) he is qualified for the position from which he was terminated; (3) he was fired from the employment position; and (4) under circumstances which raise an inference of discriminatory action, the employer replaced the plaintiff with an individual not within the protected class with qualifications similar to those which the plaintiff possessed.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2003).  The plaintiff must show all four factors by a preponderance of the evidence to make his *prima facie* case.  See Sarullo, 352 F.3d at 797.

---

[34] When a Title IX employment discrimination claim is asserted, courts typically apply the same substantive standards for reviewing claims brought under Title VII. See, e.g., Murray v. New York University College of Dentistry, 57 F.3d 243, 248 (2d Cir. 1995); Preston v. Com. of Va. ex rel. New River Community College, 31 F.3d 203, 206-07 (4th Cir. 1994). As the defendant points out, however, the question of whether Title IX entitles an employee to a private right of action is an open question in this Circuit. Other Circuits are split. See Lakoski v. James, 66 F.3d 751, 758 (5th Cir. 1995)(no private right); and Waid v. Merrill Area Pub. Sch., 91 F.3d 857, 862 (7th Cir. 1996)(same); with Preston v. Com. of Va. ex rel. New River Community College, 31 F.3d 203, 206-07 (4th Cir. 1994)(implied private right); and Lipsett v. Univ. of P.R., 864 F.2d 881, 897 (1st Cir. 1988)(same). I do not need to address this question, however, because Dr. Kortyna failed to state a claim of sex discrimination or retaliation, even if a private right exists.

[35]  The PHRA provides that employers shall not discriminate on the basis of "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability."  See 43 P.S. § 955(a). Courts interpret the PHRA to be consistent with Title VII. See, e.g., Weston v. Pennsylvania, 251 F.3d 420, 426 n. 3 (3d Cir.2001) (explaining how Title VII and PHRA analysis are similar); see also Hussein v. UPMC Mercy Hosp., 466 F.App'x 108, 111–12 (3d Cir. 2012). The *prima facie* case for employment discrimination necessary for an employment discrimination claim under the PHRA is the same as under Title VII and the ADA. See, e.g., Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002); Dici v. Commonwealth of Pa., 91 F.3d 542, 552 (3d Cir. 1996).

Even viewing the facts in the light most favorable to the plaintiff, I cannot find that Dr. Kortyna has established a *prima facie* case of employment discrimination based on sex.  While the first three factors are met, Dr. Kortyna provides no evidence that his termination was based on circumstances which would raise an inference of discriminatory action based on sex, gender, or gender stereotypes.  The only allegations he makes which might slightly support such an inference are: (1) the allegation that Provost Hill continued the investigation against him was because he "cried" and exhibited "intense and insistent emotional behavior" in front of HW, and (2) a passing comment by Acting Provost Cohn that he "should still be punished with at least a substantial suspension… because [he] cried in front of the students."[36]  Dr. Kortyna claims these statements show that he was being discriminated against because he did not conform to male gender stereotypes.  See Bibby v. Philadelphia Coca Cola Bottling Co., 260 F.3d 257, 262-65 (3d Cir. 2001) (explaining discrimination based on an individual's failure to conform with gender stereotypes is actionable); see also Price Waterhouse v. Hopkins, 490 U.S. 228, 250-52 (1989).

If Acting Provost Cohn or Provost Hill were the final decisionmaker in the termination, Dr. Kortyna might have a semblance of a claim.  See Bibby, 260 F.3d at 262-65.  Dr. Kortyna provides no evidence, however, to link the alleged conduct of Provost Hill or Acting Provost Cohn to his eventual termination—a sanction which was

---

[36] Dr. Kortyna also baldly alleges that the students' statements that he was "lonely," "strange," "awkward," and "disconnected" further support his theory of gender stereotyping.  I fail to see a connection to how these characteristics would show the plaintiff as failing to conform to a male stereotype.

recommended by a Committee of his peers, reviewed by another Committee of his peers, enacted by President Byerly, and approved by the Board of Trustees.

Furthermore, evidence that Dr. Kortyna confronted HW "with intense and insistence emotional behavior…devoid of sexual nature" was not the reason the Committee recommended he be terminated.  Termination was the sanction the Committee recommended for Dr. Kortyna's retaliatory acts against AB after she filed harassment charges against him.[37]  Dr. Kortyna fails to connect the Committee's findings on this point with discriminatory animus based on sex or a failure to conform to gender stereotypes. [38]

Lastly, Dr. Kortyna alleges only that he was replaced by a "less-qualified, less-experienced, and non-disabled individual."  He gives no indication that he was replaced by a woman or even by a man who exhibited the male gender stereotypes that he allegedly did not.

Instead, Dr. Kortyna tries to create a disparate treatment claim by pointing to the allegedly less favorable treatment he received during the disciplinary proceedings as compared to the two female students who accused him of sexual harassment.  He claims

---

[37] The plaintiff explicitly relies on this report in his amended complaint.  The defendant attached the report to its motion.  Thus, I may consider it in deciding this motion to dismiss without converting the motion to one for summary judgment.  See In re Burlington Coat Factory, 114 F.3d at 1426.

[38] Dr. Kortyna claims that his act of "apologizing" to AB—which the Committee viewed as a retaliatory act—was further evidence that he was discriminated against for failing to conform to male stereotypes.  This claim is insufficient to raise an inference of discriminatory intent, however, because Dr. Kortyna fails to note that it was the statement he made during the apology, i.e., that AB's action would get him fired, with which the Committee took issue—not the fact that he apologized.

the College was more likely to deviate from its prescribed procedures for the female

students, while it would not do so for him.  Unfortunately, the students are not

appropriate comparators.  Dr. Kortyna provides no evidence that a female or even a male

conforming to masculine stereotypes accused of similar charges was treated differently

than he was.  Accordingly, because Dr. Kortyna's bald assertions fail to state a claim on

which relief could be granted,[39] I will dismiss Dr. Kortyna's claims of employment

discrimination based on sex in Counts I, III, and IX.[40]  See Twombly, 550 U.S. at 555.

---

[39] Dr. Kortyna also implies that certain facts in this case would give rise to an inference of
discrimination, i.e., Provost Hill is a woman, the two students who filed charges against him are
women, and the sexual harassment charges were later found to be unsubstantiated.  See Bibby,
260 F.3d at 262 ("[I]t is not the sex of the harasser or the victim that is important to a sexual
harassment claim, but, rather, what is important is that the victim 'prove that the conduct at issue
was not merely tinged with offensive sexual connotations, but actually constituted
discriminat[ion] ... because of ... sex.'" (quoting Oncale v. Sundowner Offshore Services, Inc.,
523 U.S. 75, 81(1998))(internal quotation marks omitted)).  This point may have some weight if
the sexual harassment charges themselves were the reason Dr. Kortyna was terminated.  They
were not.  It was Dr. Kortyna's actions in response to the charges brought against him,
specifically related to AB, which led to his termination.

[40] Despite language in his complaint to the contrary, the plaintiff in his response to the motion to
dismiss contends that this claim is not a hostile work environment claim but instead is a disparate
treatment claim.  See Plaintiff's Response, Document #27 at 1 n. 2.  From this, it appears the
defendant's arguments against a hostile work environment claim are moot because the plaintiff
has implicitly conceded that he cannot make out a "hostile work environment" claim.

Even so, the plaintiff's amended complaint would fail to show liability for hostile work
environment.  To state a "hostile work environment" claim for sex discrimination, a plaintiff
must plead sufficient facts to show: (1) he suffered intentional discrimination because of his sex;
(2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected
plaintiff; (4) it would have detrimentally affected a reasonable person of the same protected class
in the plaintiff's position; and (5) there is a basis for vicarious liability.  Cardenas v. Massey, 269
F.3d 251, 260 (3d Cir. 2001).

Even viewing the facts in the light most favorable to him, Dr. Kortyna has not provided plausible
allegations that he was being intentionally discriminated against because of his sex.
Furthermore, there appears to be no basis for vicarious liability for statements made about his
failure to conform to gender stereotypes.  The plaintiff points to two people who allegedly

2.  Claims of Retaliation

Dr. Kortyna claims that he had made several complaints to the College about "unlawful sex discrimination" towards him, related to the investigation of the students' sexual harassment complaints. [41]  He claims these complaints were never investigated, yet the College continued to retaliate against him, including terminating him. [42]

---

showed discriminatory bias against him for failing to conform to gender stereotypes—Provost Hill and Professor Cohn.  While both had some involvement in his disciplinary proceedings, neither was on the Hearing Committee or the Review Committee that recommended he be terminated, or on the Board of Trustees that approved the final decision to terminate him.

[41]  The amended complaint alleges that Dr. Kortyna emailed Ms. Muhlfelder several times to report sex discrimination.  The College did not respond.  On December 5, 2013, he filed a formal grievance against Provost Hill for sex discrimination.  Again, the College failed to respond.  On March 4, 2014, Dr. Kortyna filed another formal complaint of sex discrimination with Dean McKnight.  As explained above, retaliation claims related to these complaints are precluded as adverse actions taken before the first federal action.

On July 15, 2014, Dr. Kortyna also submitted a written complaint to President Byerly outlining the defendant's "pattern of unlawful sex discrimination and sex stereotyping through the investigation and hearing process."

[42] Dr. Kortyna also claims that the defendant retaliated against him by creating "a retaliatory hostile work environment."  See Am.Compl. ¶ 56.  Such alleged retaliatory acts include:
- an admission by Dean McKnight that the student complaints could not be construed as "sexual harassment;"
- refusing to provide Dr. Kortyna with other "frivolous" complaints HW and AB had made against other faculty members when Dr. Kortyna requested them in February 2014, before the hearing;
- Public Safety Officer John Meyer's request for Dr. Kortyna and Katalin Fabian, his Faculty advocate for the hearing, to meet him "immediately" on March 8, 2014 at 8 p.m. at which time he accused Dr. Kortyna of "threatening HW and AB by hiring an attorney;"
- a "secretive" off-campus meeting on March 10, 2014 between McKnight, Kortyna, and Professor Olga Anna Duhl (Chair of Defendant's Sexual Harassment Oversight Committee) at which McKnight and Duhl indicated the student complaints had been "mishandled from the beginning" but there was "nothing [they] could do about cases of gender discrimination;"
- an email by Provost Hill on March 11, 2014 "unjustifiably accusing [Dr. Kortyna] of insubordination, misconduct, and retaliation against HW and AB;" and

To assert a retaliation claim under Title VII, Title IX, and the PHRA, a plaintiff must plead: (1) the invocation of a protected right under these statutes, (2) an adverse employment action, and (3) a causal link between the first and second prongs. See Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 320 (3d Cir. 2008).

Even viewing these allegations in the light most favorable to Dr. Kortyna, his amended complaint fails to plausibly link his claims of sex discrimination to his eventual termination. First, the timeline of events makes this claim implausible. He made the complaints of sex discrimination during 2013 and 2014, yet was terminated many months later, i.e., on March 31, 2015. Further, there is no evidence that anyone on the Hearing Committee or the Review Committee, who recommended the plaintiff's termination to President Byerly, was aware of the sex discrimination complaints he had submitted. Such failure to connect the first and second prongs of this inquiry is insufficient to establish a retaliation claim under Title VII, Title IX, or the PHRA.[43]  See Twombly, 550 U.S. at 555. Accordingly, I will dismiss Counts II, IV, and XI.

---

- an email by President Byerly on March 11, 2014 which also "unjustifiably" accused Dr. Kortyna of "failing to follow Defendant's 'directives.'"

The Committee also allegedly prohibited Dr. Kortyna from asking HW's boyfriend "a probative question regarding her complaints" on cross-examination, which he claims was retaliation for his own complaints against the defendants.

These events all occurred prior to the filing of the first federal lawsuit, yet this information was not included in the Kortyna I complaint. Thus, the plaintiff's retaliation claims based on these alleged adverse employment actions are precluded, as explained above.

[43] Dr. Kortyna also claims that the Committee's decision to proceed with the hearings, though HW would not be present, was a retaliatory act. While this occurred after the first federal action, it still provides no basis for liability. HW was present and ready to be cross-examined at the first set of hearings, but Dr. Kortyna indicated that his health would not permit him to continue. HW had graduated and moved on by the time the second set of hearings commenced. He further

3.  <u>Claims of Discrimination based on the ADA, Section 504, and PHRA</u>

Dr. Kortyna alleges claims of discrimination based on disability in Count V under the ADA, in Count VII under Section 504, and in Count X under the PHRA.  As discussed above, Counts V and VII are dismissed based on issue preclusion.  Thus, I will address Count X, to the extent it is not precluded.

To make out a *prima facie* claim of disability discrimination under the PHRA, the employee bears the burden of showing that: (1) he has a disability; (2) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he suffered an adverse employment action as a result of discrimination.  <u>See</u> <u>Williams v. Philadelphia Housing Authority Police Dept.</u>, 380 F.3d 751, 761 (3d Cir. 2004)(citations omitted); <u>see also</u> <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996) (Since the PHRA definition of disability is substantially similar to the ADA definition, a district court should treat PHRA and ADA claims coextensively.  The same reasoning that applies to the plaintiff's Title VII sex discrimination claim and ADA claim would also apply to his discrimination claims under the PHRA).

Beyond reasserting his "right" to an attorney as a reasonable accommodation, despite my ruling to the contrary in <u>Kortyna</u> I, Dr. Kortyna has offered no other evidence

---

alleges that President Byerly's decision to give him a two-year suspension regarding HW's case and not a six month suspension, as the Review Committee had recommended, was an act of retaliation.  The plaintiff has failed to link these actions to his eventual termination.

to establish the elements of a *prima facie* case of discrimination under the PHRA.[44]  As his claim is merely speculative, Count X will be dismissed. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

### 4.   Claims of Retaliation based on the ADA and Section 504

Dr. Kortyna claims that he was retaliated against "for requesting a reasonable accommodation, and for opposing unlawful disability discrimination in the workplace" *via* his first federal lawsuit.[45]  To establish a *prima facie* case for retaliation under the ADA and Section 504, a plaintiff must show: (1) he engaged in a protected action, (2) his employer took an adverse action after his protected action, and (3) there is a causal connection between his protected action and the adverse employment action.  Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002).

The first two prongs of his *prima facie* case of retaliation are established.  Dr. Kortyna brought an employment discrimination action against his employer based on disability, and was terminated almost a year later.  The third and final element that he needs to establish is a causal connection between the filing of his first federal action and his termination.  Fogleman, 283 F.3d at 567.  A causation analysis often, but not

---

[44] In fact, evidence in the record contradicts any sort of discrimination claim based on disability. Dr. Kortyna was cleared by his doctor to return to work when his FMLA leave ended, calling into question his status as "disabled."  There is also evidence that the College allowed his attorney to be on site during the hearing.  See Am.Compl. ¶ 79.

[45] In his response to the defendant's motion, the plaintiff states: "Although Kortyna II reiterates the allegation that the Defendant failed to accommodate him, (see Kortyna II at ¶¶ 70, 97), Plaintiff neither bases a claim nor premises a request for relief on the Kortyna I-failure to accommodate theory."  By this, I can only assume the plaintiff means that he is not seeking relief from a failure to accommodate but may be seeking relief based on a retaliation theory related to his termination.

exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation; and (2) the existence of any pattern of antagonism in the intervening period." Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006) (internal quotations omitted).  "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-504 (3d Cir. 1997)).  In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference.")  Regardless of the evidence a plaintiff relies on to establish causation, however, a plaintiff must also satisfy an initial gateway requirement by establishing that the defendant knew of the plaintiff's protected activity.  See Ambrose v. Township of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decision makers must be aware of the protected conduct.")

Here, there is no dispute that the defendant was aware of the filing of the first federal action which Dr. Kortyna filed against it.  Next, there is no temporal proximity between the two reports of the College Hearing Committee and Dr. Kortyna's

termination.  The Hearing Committee's report on the complaint filed by HW is dated

November 3, 2014.  Its report on the complaint filed by AB is dated November 19, 2014.

Dr. Kortyna was terminated on March 31, 2015, over four months after the reports were

issued, a period well beyond the length of time that is generally held to be unusually

suggestive of temporal proximity.  See Blakney v. City of Phila., 559 F.App'x 183, 186

(3d Cir. 2014) (not precedential) ("We have found that a temporal proximity of two days

is unusually suggestive of causation, but have held that a temporal proximity greater than

ten days requires supplementary evidence of retaliatory motive." (citations omitted));

Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (finding temporal

proximity not unduly suggestive where three weeks elapsed between protected activity

and adverse employment action); Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597

(E.D. Pa. 2014) ("Absent some intervening antagonism, Plaintiff cannot rest solely on a

temporal proximity of more than one week."); Abdul-Latif v. Cnty. of Lancaster, 990 F.

Supp. 2d 517, 531 (E.D. Pa. 2014) ("Six days is at the long end of what has been held to

be unusually suggestive . . . .").

Nonetheless, because temporal proximity is missing in this case, I may look to the

period between the Hearing Committee's reports and Dr. Kortyna's termination for other

evidence of retaliatory animus.  Jensen, 435 F.3d at 450.  Dr. Kortyna cites a portion of

the Hearing Committee's reports which he contends confirms that it viewed Kortyna I as

a "negative factor" in arriving at its decision to find against him.  Thus, he alleges that the

report is evidence of a causal connection between filing his first federal action and his

termination.  After a careful review, however, I can find no such confirmation in the

College's report.  The term "negative factor" appears to be the plaintiff's characterization

of what is contained in the report, which states in relevant part:

> While we understand that Professor Kortyna has the right
> to consult with external counsel, this lawsuit was an
> appeal to the federal court system to interfere with the
> College process, and to insist that Professor Kortyna's
> outside counsel be permitted to participate in the
> Hearings.   This action demonstrated both Professor
> Kortyna's and Mr. Ferleger's utter disregard for the
> College's Hearing Committee and process. . . .
>
> In sum, the Hearing Committee has dedicated itself to its
> charge in good faith, despite the accused's numerous and
> at times unrelenting challenges to the process and
> procedures outlined in the Faculty Handbook.   We
> emphasize, however, that these actions on the part of the
> accused did not materially affect the substance of our
> deliberations – only their duration.

It is apparent that the College acknowledged the disregard for the process displayed by

Dr. Kortyna and his attorney.  The College also acknowledged, however, that it did not

permit Dr. Kortyna's "numerous and at times unrelenting challenges to the process" to

materially affect the substance of the Hearing Committee's deliberations.  The Hearing

Committee's reports cannot be read as evidence sufficient enough to raise the inference

of causation.  Moreover, the amended complaint contains no other allegations during the

intervening period between the reports and the termination which might raise the

inference of causation.  Thus, the third prong to establish a *prima facie* case of retaliation

based on the ADA and Section 504 is not satisfied.  Accordingly, I will grant the

defendant's motion to dismiss Counts VI and VIII.

5.  <u>Interference with FMLA Rights</u>

In Count XII, Dr. Kortyna claims that the defendant's delay in letting him return to campus when he was "medically capable" was an interference with his FMLA rights.  I must agree.

"The FMLA provides that it 'shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right' that it guarantees." <u>Budhun v. Reading Hosp. and Medical Center</u>, 765 F.3d 245, 252 (3d Cir. 2014)(quoting 29 U.S.C. § 2615(a)(1); citing 29 C.F.R. § 825.220(b)).  To state a claim for FMLA interference, the plaintiff must plead that he was entitled to FMLA benefits and was denied them.  <u>See Callison v. City of Phila.</u>, 430 F.3d 117, 119 (3d Cir. 2005).  One of the benefits the FMLA provides is the right to be restored to his position of employment upon return from FMLA leave.  <u>See Budhun</u>, 765 F.3d at 252.  "An employee may not be required to take more FMLA leave than necessary to resolve the circumstance that precipitated the need for leave."  29 C.F.R. § 825.311(c).

Here, Dr. Kortyna claims that his right to return from FMLA leave was denied even though he provided conclusive medical evidence verifying his ability to return to work.[46]  To establish his claim, he alleges that: (1) his psychologist Dr. Chupella emailed Lisa Rex, defendant's Director of Human Resources-Employment on May 26, 2014, requesting that he be allowed to return from his FMLA leave because he was now

---

[46] The defendant argues that the plaintiff was not denied FMLA leave because he took his full twelve-week entitlement.  The defendant failed to address, however, the plaintiff's allegation that the defendant interfered with his entitlement to return to work from FMLA when he was medically able to do so.

"medically capable of doing so;" (2) Dr. Kortyna emailed Ms. Rex on June 6, 2014 and requested she respond to Dr. Chupella's May 26th email; and (3) Dr. Kortyna allegedly emailed Ms. Rex again on June 27, 2014, requesting the same.[47]  She allegedly did not respond to any of these emails.  Dr. Kortyna alleges that he was eventually allowed to return to work, after his full twelve week FMLA leave period had expired, when Patricia Lechleitner, an investigator from the Department of Labor, "instructed" the College to permit Dr. Kortyna to return to campus.  See Am.Compl. ¶ 86.  On August 1, 2014, he received a formal letter *via* email from Ms. Rex advising him that he was restored from FMLA leave to his position as a full-time professor.

Viewing these facts in the light most favorable to the plaintiff, the plaintiff has established a *prima facie* case that the College interfered with his right to return from FMLA.  Accordingly, I will deny the defendant's motion to dismiss Count XII of the amended complaint.

### 6.  FMLA Retaliation

Dr. Kortyna claims that he was retaliated against because he exercised his right to take FMLA leave.  Specifically, he alleges that when he was restored to his position of full-time professor he was instructed "to continue to honor the invalid, non-adjudicated 'no contact' order between HW and AB."  He claims his "frivolous non-contact order

---

[47] See Am.Compl. ¶ 79. Dr. Kortyna also claims that he emailed President Byerly on May 30, 2014, requesting access to his lab and office. He places this request in the context of a request to return from FMLA leave. He also claims he emailed Dr. Byerly on July 7, 2014, "requesting that she lift Defendant's retaliatory ban and allow him to return to campus."  See Am.Compl. ¶ 81.

rendered her letter the effective equivalent of a formal letter of reprimand, in clear

retaliation for [his] utilization of FMLA leave."  See Am.Compl. ¶ 87.  I do not agree.

     To plead an FMLA retaliation claim, a plaintiff must show that: (1) he invoked a

right under the FMLA, (2) an adverse employment action resulted thereafter, and (3)

there is a causal link between the first two prongs.  See Lichtenstein v. Univ. of

Pittsburgh Med. Ctr., 691 F.3d 294, 301-302 (3d Cir. 2012).

     It is clear that the no-contact order was in place when Dr. Kortyna took FMLA

leave.  I fail to see how reiterating this already in-place no-contact order could serve as

retaliation against him.[48]   An employee is only entitled to reinstatement to the position

held before he invoked his FMLA rights.[49]  Prior to his taking his FMLA in April 2014,

Dr. Kortyna had been ordered to not have contact with HW and AB.[50]

---

[48] The plaintiff also alleges that he filed a formal complaint with Ms. Rex about his FMLA
retaliation, to which she did not respond. He implies that this is an infringement on his FMLA
rights. However, he leaves the court guessing as to how this non-response adversely affected his
employment. Even if I were to assume his termination is a retaliatory adverse employment
action, the plaintiff has failed to provide any evidence of a causal link between the filing of this
FMLA complaint and his eventual termination several months later.  This allegation too fails to
support an FMLA retaliation claim.

[49] See 29 C.F.R. § 825.214 ("On return from FMLA leave, an employee is entitled to be returned
to the same position the employee held when leave commenced, or to an equivalent position with
equivalent benefits, pay, and other terms and conditions of employment."); see also 29 C.F.R. §
825.216(a)("An employee has no greater right to reinstatement or to other benefits and
conditions of employment than if the employee had been continuously employed during the
FMLA leave period.")

[50] The exact date on which this no-contact order was given to Dr. Kortyna is unclear.  The
Committee reported that Provost Hill had instructed Dr. Kortyna not to speak to the students
about the charges when she informed him of them in October 2013.  However, the Committee's
report explicitly indicates that he was instructed on March 8, 2014 when the "Prohibition from
Contact Notice" was read aloud by the Associate Director of Public Safety James Meyer.  While
Dr. Kortyna's complaint alludes to the March 8, 2014 incident, Dr. Kortyna did not provide these
details in his complaint.  However, I may consider them because the report was attached to the

Dr. Kortyna also claims that he was terminated in retaliation for taking FMLA leave.  As support, he cites a portion of the Committee's report which "accused" him of utilizing his FMLA leave "as a means of filing a sex discrimination complaint against both students."

Dr. Kortyna is correct that the Committee viewed Dr. Kortyna as "taking advantage of his medical leave to try to initiate a whole new other disciplinary process." But this statement fails to put the Committee's concern in context.  The Committee's report more fully explains facts which Dr. Kortyna neglects to include in his amended complaint.  Specifically, Dr. Kortyna attempted to file sexual harassment charges against AB and HW in the late spring and summer of 2014.  The Committee questioned the timing of these charges given that they were made nine months after the students first filed their charges against him and while the hearing on those charges was suspended because Dr. Kortyna was on FMLA leave.  The fact that Dr. Kortyna was on FMLA at the time he filed these charges is noteworthy because Dr. Kortyna asked that the prosecution of the charges against the students be expedited, despite the fact that the original charges against him could not be.  The Committee considered his acts, in context, to be ones of retaliation and intimidation against his student accusers.  The Committee's discussion is insufficient to provide a causal link necessary to make out a *prima facie* FMLA retaliation claim.  Even viewing these facts in the light most favorable

---

defendant's motion and is "integral to and explicitly relied on in the complaint."  <u>See</u> <u>In re</u> <u>Burlington Coat Factory</u>, 114 F.3d at 1426.

to him, Dr. Kortyna has not established that the invocation of his FMLA rights resulted in

his termination.  Accordingly, I will grant the defendant's motion to dismiss Count XIII.

7.  <u>Breach of Contract</u>[51]

Dr. Kortyna claims that the College "materially breached its contract with [him]

by failing to adhere to its own policies and procedures governing disciplinary

proceedings set forth in the Faculty Handbook."  I do not agree.

To state a claim for breach of contract under Pennsylvania law, a plaintiff must

adequately plead "(1) the existence of a contract, including its essential terms, (2) a

breach of duty imposed by the contract, and (3) resulting damages."  <u>Chemtech Int'l, Inc.</u>

<u>v. Chem. Injection Techs., Inc.</u>, 170 F.App'x 805, 807 (3d Cir. 2006)(citing <u>Lackner v.</u>

<u>Glosser</u>, 892 A.2d 21, 30 (Pa. Super. 2006).  The parties agree that the Faculty

Handbook's procedures—outlined above—govern the parties' relationship and provide

the essential terms of how the sexual harassment charges should have been investigated.

Dr. Kortyna appears to cite his termination as "the resulting damages."

Dr. Kortyna, however, fails to offer plausible allegations that the College

materially breached the duties prescribed by the Handbook.  As the following examples

will show, many of the alleged breaches the plaintiff offers to support his claim are mere

"bald assertions:" (1) Provost Hill's issuance of investigative reports "failed to cite to any

behavior on behalf of Plaintiff Kortyna which met the definition of sexual harassment;"

(2) Provost Hill's imposition of retaliation charges against Dr. Kortyna was improper; (3)

---

[51] I agree with the plaintiff that he could not have asserted a breach of contract claim in his prior
lawsuit.  At that time, the plaintiff had suffered no cognizable damages.

the Committee's denial of Dr. Kortyna's request to call himself and his psychologist Dr. Chupella as witnesses;[52] (4) the Review Committee failed to address Dr. Kortyna's procedural errors; and (5) the Board of Trustee's failed to address Dr. Kortyna's noted procedural errors.  Dr. Kortyna simply states that these actions were violations of portions of the Handbook without establishing that these Sections gave rise to a duty owed him and/or that this duty was in fact breached.  Other allegations are cited as violations of the terms of the Faculty Handbook when, in fact, these actions were in line with prescribed procedures.[53]  The remaining allegations involve possible deviations in the Handbook's prescribed process:

> (1) that the hearing did not occur within twenty-one days of the Hearing Committee informing Dr. Kortyna that a hearing would be held, in violation of Section B.3.5;

> (2) the Committee's decision to conduct hearings on HW's complaint though she was not present for the continuation of the hearings, in violation of Section B.3.7;

> (3) Provost Hill's denial of his request to respond to the students' complaints when he first became aware of them in October 2013 and before any investigative interviews took place, in violation of Sections B.2.4.2.2 and B.3.2;

> (4) Provost Hill's presenting him with a "new" nine-page complaint by HW after she interviewed her, in violation of Sections B.2.4.2.2 and B.3.2; and

---

[52] To clarify, it appears from the record that Dr. Kortyna testified in front of the Committee (given that his testimony was cited in the Committee's Reports).  However, he was not permitted to call himself as a witness.

[53] For example, Provost Hill's failure to "immediately dismiss" the students' complaints, Provost Hill's attempt to "force" Dr. Kortyna to accept dismissal, and Provost Hill's "abruptly declari[ing] an end to resolution-negotiations with Plaintiff Kortyna" so that the hearing process could begin were all procedures the Provost is expected or permitted to pursue under the dictates of the Handbook, as explained above.

(5) Defendant's refusal to address Dr. Kortyna's grievance against Provost Hill for her discriminatory handling of her investigation, in violation of Section D.3.2.5.

Yet, Dr. Kortyna fails to show how the remaining violations were "material," resulting in his termination.  Dr. Kortyna was terminated because of his retaliatory actions against AB, not for the harassment complaints made by HW.  His termination also occurred after he had the opportunity to defend the charges against him at a hearing.  His termination was based on factual findings made by a Committee, which did not include Provost Hill. Even viewing these facts in the light most favorable Dr. Kortyna, I see no evidence indicating that these procedural deviations amounted to material breaches.  Because Dr. Kortyna has failed to state a plausible breach of contract claim,[54] I will dismiss Count XIV.  See Twombly, 550 U.S. at 555.

An appropriate Order follows.

---

[54] Dr. Kortyna also claims the Committee breached its Handbook procedures by adding new charges of retaliation when the hearing resumed in September 2014.  He claims those charges— which involved his actions while the hearing was suspended—should have gone through the whole investigation procedure undertaken with the previously charges.  From what Dr. Kortyna has pled, it is unclear whether this possible deviation on procedure was a breach of a contractual duty.  Even if it could be considered such, the plaintiff fails to establish how this breach was material, given that the plaintiff was given an opportunity to rebut the charges and a hearing on them was held during the hall of 2014.